[No. 45324. En Banc. April 19, 1979.]

EDWIN MIESKE, ET AL, *Respondents,* v. THE BARTELL DRUG COMPANY, ET AL, *Appellants.*

*Steven S. Bell* and *Perkins, Coie, Stone, Olsen & Williams,* for appellants.

*Charles W. Mertel, A. Richard Dykstra,* and *Scholfield & Stafford,* for respondents.

BRACHTENBACH, J.—This case determines the measure of damages for personal property, developed movie film, which is destroyed, and which cannot be replaced or reproduced. It also decides the legal effect of a clause which purports to limit the responsibility of a film processor to replacement of film.

We will detail the facts later, but the heart of the matter is that plaintiffs delivered already developed movie film to a retail store for the sole purpose of having the film spliced onto larger reels. The film was lost or destroyed by the retailer's processing agent. A jury verdict of $7,500 was returned against the retailer and the agent–processor. Those defendants appeal. We affirm.

The facts are that over a period of years the plaintiffs had taken movie films of their family activities. The films started with the plaintiffs' wedding and honeymoon and continued through vacations in Mexico, Hawaii and other places, Christmas gatherings, birthdays, Little League participation by their son, family pets, building of their home and irreplaceable pictures of members of their family, such as the husband's brother, who are now deceased.

Plaintiffs had 32 50–foot reels of such developed film which they wanted spliced together into four reels for convenience of viewing. Plaintiff wife visited defendant Bartell's camera department, with which she had dealt as a customer for at least 10 years. She was told that such service could be performed.

The films were put in the order which plaintiffs desired them to be spliced and so marked. They were then placed in four separate paper bags which in turn were placed in one large bag and delivered to the manager of Bartell. The plaintiff wife explained the desired service and the manner in which the films were assembled in the various bags. The manager placed a film processing packet on the bag and gave plaintiff wife a receipt which contained this language: "We assume no responsibility beyond retail cost of film unless otherwise agreed to in writing." There was no discussion about the language on the receipt. Rather, plaintiff wife told the manager, "Don't lose these. They are my life."

There was no discussion or agreement about who was going to perform the splicing service.

Bartell sent the film package to defendant GAF Corporation, which intended to send them to another processing lab for splicing. Plaintiffs assumed that Bartell did this

service and were unaware of the involvement of two other firms.

The bag of films arrived at the processing lab of GAF. The manager of the GAF lab described the service ordered and the packaging as very unusual. Yet it is undisputed that the film was in the GAF lab at the end of one day and gone the next morning. The manager immediately searched the garbage disposal dumpster which already had been emptied. The best guess is that the plaintiffs' film went from GAF's lab to the garbage dumpster to a truck to a barge to an up–Sound landfill where it may yet repose.

After several inquiries to Bartell, plaintiff wife was advised to call GAF. Not surprisingly, after being advised of the complete absence and apparent fatality of plaintiffs' films, this lawsuit ensued.

At trial defendants Bartell and GAF denied liability. The janitorial service company which apparently removed the film was a defendant. The verdict was against Bartell and GAF but not against the janitorial service company. It is not a party to the appeal. For purposes of appeal, Bartell and GAF admit liability for negligence.

Two main issues are raised: (1) the measure of damages and (2) the effect of the exclusionary clause appearing on the film receipt.

On damages, the defendants assign error to (a) the court's damages instruction and (b) the court's failure to give their proposed damages instruction.

■ The standard of recovery for destruction of personal property was summarized in *McCurdy v. Union Pac. R.R.*, 68 Wn.2d 457, 413 P.2d 617 (1966). We recognized in *McCurdy* that (1) personal property which is destroyed may have a market value, in which case that market value is the measure of damages (2) if destroyed property has no market value but can be replaced or reproduced, then the measure is the cost of replacement or reproduction; (3) if the destroyed property has no market value and cannot be replaced or reproduced, then the value to the owner is to be the proper measure of damages. However, while not stated

in *McCurdy*, we have held that in the third *McCurdy* situation, damages are not recoverable for the sentimental value which the owner places on the property. *Herberg v. Swartz*, 89 Wn.2d 916, 578 P.2d 17 (1978); *Palin v. General Constr. Co.*, 47 Wn.2d 246, 287 P.2d 325 (1955); *Kimball v. Betts*, 99 Wash. 348, 169 P. 849 (1918).

The defendants argue that plaintiffs' property comes within the second rule of *McCurdy*, *i.e.*, the film could be replaced and that their liability is limited to the cost of replacement film. Their position is not well taken. Defendants' proposal would award the plaintiffs the cost of acquiring film without pictures imposed thereon. That is not what plaintiffs lost. Plaintiffs lost not merely film able to capture images by exposure but rather film upon which was recorded a multitude of frames depicting many significant events in their lives. Awarding plaintiffs the funds to purchase 32 rolls of blank film is hardly a replacement of the 32 rolls of images which they had recorded over the years. Therefore the third rule of *McCurdy* is the appropriate measure of damages, *i.e.*, the property has no market value and cannot be replaced or reproduced.

The law, in those circumstances, decrees that the measure of damages is to be determined by the value to the owner, often referred to as the intrinsic value of the property. Restatement of Torts § 911 (1939).

██ Necessarily the measure of damages in these circumstances is the most imprecise of the three categories. Yet difficulty of assessment is not cause to deny damages to a plaintiff whose property has no market value and cannot be replaced or reproduced. *Jacqueline's Washington, Inc. v. Mercantile Stores Co.*, 80 Wn.2d 784, 498 P.2d 870 (1972); Restatement of Torts § 912 (1939).

The fact that damages are difficult to ascertain and measure does not diminish the loss to the person whose property has been destroyed. Indeed, the very statement of the rule suggests the opposite. If one's destroyed property has a market value, presumably its equivalent is available on the market and the owner can acquire that equivalent property.

However, if the owner cannot acquire the property in the market or by replacement or reproduction, then he simply cannot be made whole.

■ The problem is to establish the value to the owner. Market and replacement values are relatively ascertainable by appropriate proof. Recognizing that value to the owner encompasses a subjective element, the rule has been established that compensation for sentimental or fanciful values will not be allowed. *Herberg v. Swartz, supra; Palin v. General Constr. Co., supra; Kimball v. Betts, supra.* That restriction was placed upon the jury in this case by the court's damages instruction.

What is sentimental value? The broad dictionary definition is that sentimental refers to being "governed by feeling, sensibility, or emotional idealism . . ." *Webster's Third New International Dictionary* (1963). Obviously that is not the exclusion contemplated by the statement that sentimental value is not to be compensated. If it were, no one would recover for the wrongful death of a spouse or a child. Rather, the type of sentiment which is not compensable is that which relates to "indulging in feeling to an unwarranted extent" or being "affectedly or mawkishly emotional . . ." *Webster's Third New International Dictionary* (1963).

Under these rules, the court's damages instruction[1] was correct. In essence it allowed recovery for the actual or

---

[1]Instruction No. 11:

"It is the duty of the court to instruct you as to the measure of damages. You must determine the amount of money which will reasonably and fairly compensate plaintiff for such damages as you find were proximately caused by the negligence of any one or all of the defendants.

"In reaching your verdict you should consider the following elements: the value of the firm to the plaintiff, the actual or intrinsic value of the film including cost of film and processing such film and such other considerations as will fairly and justly compensate plaintiffs for any loss sustained had the damage in question not been sustained.

"The law does not permit recovery for the sentimental value of the film to the plaintiff or a fanciful price which plaintiff might for special reasons place thereon.

"The burden of proving damages rests with the plaintiff and it is for you to determine whether any particular element has been proved by a preponderance of

intrinsic value to the plaintiffs but denied recovery for any unusual sentimental value of the film to the plaintiffs or a fanciful price which plaintiffs, for their own special reasons, might place thereon.

It was proper to reject defendants' proposed damages instruction since it was an erroneous statement of the law. It would have allowed "the amount of money which will reasonably and fairly compensate the plaintiffs for such damages as you find were proximately caused by the negligence of the defendants. If you find for the plaintiffs, your verdict should include the cost to replace or reproduce the lost or destroyed property."

■ The proposed instruction did not limit recovery to replacement cost only, which was defendants' theory of the case, nor did it deny recovery for sentimental value alone. Consequently, it was too broad. In fact, it was a more liberal damages instruction than the one given. It is not error to refuse an instruction which is not a correct statement of the law. *Rickert v. Geppert,* 72 Wn.2d 1040, 432 P.2d 645 (1967).

The next issue is to determine the legal effect of the exclusionary clause which was on the film receipt given plaintiff wife by Bartell. As noted above, it read: "We assume no responsibility beyond retail cost of film unless otherwise agreed to in writing."

Is the exclusionary clause valid? Defendants rely upon RCW 62A.2–719(3), a section of the Uniform Commercial Code, which authorizes a limitation or exclusion of consequential damages unless the limitation is unconscionable.

■ Plaintiffs, on the other hand, argue that the Uniform Commercial Code is not applicable to this transaction. Their theory is that article 2, RCW 62A.2, applies only to sales and not to a bailment as was present in this case.

---

the evidence. Your award must be based upon evidence and not upon speculation, guess or conjecture. The law had not furnished us with any fixed standards by which to measure value to plaintiff or actual or intrinsic values of lost property to its owner. With reference to these matters, you must be governed by your own judgment, by the evidence in the case and by these instructions."

Plaintiffs read article 2 too narrowly. While article 2 is entitled "Sales," RCW 62A.2–101, the declared scope is more comprehensive. RCW 62A.2–102 sets the parameters of the article by its declaration that it applies to *transactions in goods,* excluding security transactions. If article 2 were limited to sales it would not be directly applicable to this bailment transaction as RCW 62A.2–106(1) defines "Sales" as the passing of title from a seller to a buyer, a factor not present here. Obviously "transactions in goods"—the scope of article 2—is broader than "sales." Had the drafters of the code intended to limit article 2 to sales they could have easily so stated. They did not.

Our analysis seems commonly accepted. *See for example* 3 Bender's U.C.C. Service, R. Duesenberg & L. King, *Sales and Bulk Transfers* § 103 [4], at 1–35 (1977), which states:

> It is now clearly established that the reach of Article 2 goes considerably beyond the confines of that type transaction which the Code itself defines to be a "sale"; namely, the passing of title from a party called the seller to one denominated a buyer for a price. Chief opportunity for this expansion is found in Section 2–102, which states that the article applies to "transactions in goods." Article 2 sections are finding their way into more and more decisions involving transactions which are not sales, but which are used as substitutes for a sale or which to a court appear to have attributes to which sales principles—or at least some of them—seem appropriate for application. . . .
>
> . . . Most important of these is the application of the Article's warranty provisions to leases, *bailments,* or construction contracts. Of growing importance is the tendency of courts to find the Section on unconscionability, Section 2–302, appropriate to nonsales deals.

(Footnotes omitted. Italics ours.) *See Glenn Dick Equip. Co. v. Galey Constr., Inc.,* 97 Idaho 216, 541 P.2d 1184 (1975); *Walter E. Heller & Co. v. Convalescent Home of 1st Church of Deliverance,* 49 Ill. App. 3d 213, 365 N.E.2d 1285 (1977); *Wille v. Southwestern Bell Tel. Co.,* 219 Kan. 755, 549 P.2d 903 (1976).

While there are cases to the contrary, *e.g., Favors v. Firestone Tire & Rubber Co.,* 309 So. 2d 69 (Fla. Dist. Ct. App. 1975), we do not find them persuasive. In fact we have held already that article 2 declares a public policy as to disclaimers and, at least by analogy, applied it to a bailment. *Baker v. Seattle,* 79 Wn.2d 198, 484 P.2d 405 (1971). (Article 2's provisions apply to lease of golf cart.)

We do not think that a distinction can be drawn between a bailment arising from a service transaction, as is the case here, and one arising from a leasing transaction, as was the case in *Baker. See Vitromar Piece Dye Works v. Lawrence of London, Ltd.,* 119 Ill. App. 2d 301, 256 N.E.2d 135 (1969). Nor do we think, for this purpose, that a proper distinction can be drawn between the lease or rental of a chattel and the sale of a chattel.

Application of the Uniform Commercial Code to this transaction leads to defendants' next two contentions. First, they urge that the code's recognition of course of dealings and trade usage validates the exclusionary clause. Second, defendants assign error to the grounds upon which the court found the clause to be unconscionable and therefore invalid.

Looking to the course of dealings and trade usage matter, we examine RCW 62A.1–201(3) which defines the agreement between the parties. It provides that the bargain between the parties includes course of dealings and usage of trade:

> (3) "Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Title (RCW 62A.1–205 and RCW 62A.2–208).

A course of dealing is defined in RCW 62A.1–205(1):

> A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

The phrase usage of trade is defined in RCW 62A.1–205(2), which provides:

> A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

■ Defendants contend that it is the uniform trade practice of film processors to impose an exclusionary clause similar to that contained in Bartell's film receipt. However, the existence of a trade usage is to be established as a fact. RCW 62A.1–205(2). It was proved as a usage among film processors, but not as between commercial film processors and their retail customers. The fact of the use of similar exclusionary language by other commercial film processors simply does not establish that the exclusion was a usage of trade understood by all consumers who dealt with Bartell. *Zicari v. Joseph Harris Co.,* 33 App. Div. 2d 17, 304 N.Y.S.2d 918 (1969). The proof fails to establish that plaintiff wife knew or should have been aware of the trade usage in question. RCW 62A.1–205(3). Consequently, defendants' reliance on trade usage to uphold the exclusionary clause is not well founded.

As to course of dealings, the record is clear that Mrs. Mieske and the Bartell manager never discussed the exclusionary clause. Mrs. Mieske had never read it, she viewed the numbered slip as merely a receipt. The manager was not "too clear on what it said." There was no showing what was the language on any other receipt given in prior dealings between the parties. In summary, defendants' proof fell short of that required by the express language of RCW 62A.1–205(3). Defendants contend we should apply a course of dealing standard as a matter of law, but cite no authority for such proposition. We decline the invitation.

■ Defendants next assert that the trial court held the exclusionary clause to be unconscionable without considering the rules laid down in *Schroeder v. Fageol Motors, Inc.,* 86 Wn.2d 256, 544 P.2d 20 (1975). In *Schroeder,* we recognized that the term unconscionable is not defined in the Uniform Commercial Code. We acknowledge that the code mandates the court to determine unconscionability as a matter of law. RCW 62A.2–302(1). *Schroeder* held that numerous factors enter into a determination of unconscionability. No one element is controlling. The court must examine all the circumstances surrounding the transaction, including conspicuousness of the clause, prior course of dealings between the parties, negotiations about the clause, the commercial setting and usage of the trade. Not each element will be applicable factually to every transaction.

In determining conscionability, the parties are to be provided "a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." RCW 62A.2–302(2). Defendants concede that there was adequate compliance with that requirement in this case. The court had before it testimony and documents as to each element it was required to consider.

The court and counsel, at several stages of the trial, specifically discussed the elements to be considered and expressly recognized the court's obligation to determine unconscionability as a matter of law. For example, the court admitted a film receipt from another major processor solely for the purpose of assisting the court in making its decision, but did not allow the document to go to the jury.

Despite this, defendants contend that the court's instruction[2] regarding the exclusionary clause was erroneous in that it required an express agreement between the

---

[2]Instruction No. 10: "The limitation of liability of Exhibit 12, the customer claim check delivered to Mrs. Mieske, is not binding on plaintiffs in the absence of a specific agreement to so limit liability. Mere acceptance without reading such a claim check does not constitute a contract between plaintiffs and Bartell Drug Company."

parties for the clause to be valid. Defendants argue that the court thus ignored the other considerations set forth in *Schroeder v. Fageol Motors, Inc., supra*. Defendants admit that the instruction was equivalent to instructing the jury that the clause was not binding since there was no evidence of a specific agreement.

It would have been preferable that the court merely instruct the jury that it had decided, as a matter of law, that the exclusionary clause was not binding on the plaintiffs. However, any error was harmless. The jury was not to decide the issue whether the clause was unconscionable. The court had testimony and documents before it in all elements required by *Schroeder*.

While the court might well have limited its instruction to a statement of its legal conclusion that the clause was not binding, defendants cannot complain that it had to explain to the jury every element of the court's decision. In fact, if anything, the instruction was advantageous to the defendants in that it allowed the jury to find the clause conscionable if it found a specific agreement between Bartell and plaintiff wife. The jury obviously did not find such an agreement.

The real question is whether the court considered the necessary elements of *Schroeder*. A review of the record convinces us that it did. The court had the facts, the *Schroeder* case was argued, the criteria set forth therein were discussed by defendants' counsel both on objections and on exceptions. There was no error in giving instruction No. 10.

Judgment affirmed.

UTTER, C.J., and ROSELLINI, STAFFORD, WRIGHT, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.